IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Dennis L. Williams, | : | |
| | : | Case No. 1:09-CV-743 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING MOTIONS FOR |
| United Steelworkers of America | | SUMMARY JUDGMENT AND |
| | : | DENYING AS MOOT THE MOTION |
| AFL-CIO Local 7679, *et al.* | : | TO STRIKE |
| | : | |
| Defendants. | : | |

This matter is before the Court on Defendants' Motions for Summary Judgment (docs. 38, 39) and Defendant Steelcraft's Motion to Strike (doc. 45).  Plaintiff Dennis L. Williams alleges a hybrid claim pursuant to Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, against his former employer, Defendant Steelcraft, Inc./Ingersoll-Rand Company ("Steelcraft"), and the union of which he was a member, Defendant United Steel Workers of America, AFL-CIO, Local 7697 ("the Union").  Williams filed his suit after Steelcraft terminated his employment for violation of a purported zero-tolerance drug policy and the Union later unilaterally withdrew his pending grievance from arbitration.  For the reasons that follow, the Court will **GRANT** Defendants' Motions for Summary Judgment and **DENY AS MOOT** Steelcraft's Motion to Strike.

I.    **BACKGROUND**

Plaintiff Dennis L. Williams was employed at the Steelcraft plant in Blue Ash, Ohio. Steelcraft manufactures doors and frames for residential and commercial structures at the plant. He worked as a forklift operator.

1

Williams was a member of the Union.  In the time period relevant here, from 2006 through 2009, the Union represented approximately 660 members.  Prior to the arbitration at issue in this lawsuit, Williams never had any issues with the Union.

**A.      The Collective Bargaining Agreement Governing Plaintiff's Employment**

Williams's employment was governed by a collective bargaining agreement (the "CBA") between the Union and Steelcraft.  The CBA granted Steelcraft the exclusive right to discipline and discharge employees "for proper cause" and "to maintain discipline and efficiency of employees (including the right to establish reasonable rules and regulations governing the conduct of employees)."  (CBA, doc. 38-3 at 24.)  The provisions of the CBA were to be applied "without regard to race, color, sex, religion, creed, national origin, age, and qualified [disability.]" (*Id.*, doc. 38-3 at 6.)  Union members who believed they had been unjustly suspended or discharged by Steelcraft were provided a four-step grievance procedure.  (*Id.*, doc. 38-3 at 22.)  If the Union was dissatisfied with Steelcraft's answers to the first three steps of the grievance process, it could appeal the grievance to arbitration.  (*Id.*)  "[T]he decision of the arbitrator . . . [was] final and binding on the Union and the Company," but "the arbitrator [had] no power to add to, subtract from or modify any of the terms of [the CBA]."  (*Id.*)

Pursuant to the CBA, Steelcraft established work rules governing employee conduct (the "Work Rules").  (*Id.*, doc. 38-3 at 24.)  Williams was familiar with the Work Rules during his employment.  Per the Work Rules enforced at the time of Williams's employment, "[s]erious conduct, which ordinarily justifies discharge for the first offense . . . ," was defined to include, inter alia, "[b]eing under the influence of, using or possession of alcoholic beverages, drugs, or any other body altering substance during scheduled working time . . . ."  (Williams Dep., Ex. A.)

This substance abuse policy was referred to as Work Rule 5.

Steelcraft asserts that Work Rule 5 was a zero-tolerance policy by which Steelcraft terminated any employees who tested positive for having "*any amount* of alcohol or illegal drugs in their systems while at work." (Parsons Dec. ¶ 7 (emphasis added). The Union also understood Work Rule 5 to be a zero-tolerance policy and a policy which only could be changed through collective bargaining. (Brammer Dec. ¶¶ 11-13.) However, the term "zero-tolerance" is not used in the Work Rules. (*Id.*; Parson Dec. ¶ 7.)

Steelcraft also enforced an apparently unwritten policy that any employee who was involved in a workplace accident at the plant was required to submit to a drug screening. (Brammer Dec. ¶ 11; Parson Dec. ¶ 24; Williams Dep. 29-30, 34.) The Union had challenged this policy when it was first implemented, but ultimately considered it to be a lawful policy under the CBA. (Brammer Dec. ¶ 11.) Williams knew Steelcraft required a drug test following workplace accidents, but he did not think that the Company had enforced the policy in all situations. (Williams Dep. 29-30, 47.)

**B.    Williams' Workplace Accident and Positive Drug Test Results**

On May 15, 2006, Williams began operating his powerlift about an hour into his shift. Williams was eating a sandwich and not wearing a seatbelt at the time. A first-shift supervisor noticed Williams and instructed him to fasten his seatbelt. Seconds after fastening his seatbelt, Williams struck a large, metal support beam called an I-beam.[1] Williams cut his mouth

---

[1] In his Response to Proposed Undisputed Facts and Statement of Disputed Issues of Material Fact (doc. 42), Plaintiff admits to the above factual statement, but purports to offer further explanation of incident. However, he cites no evidentiary materials in support of his further explanation. The Court cannot consider unsupported arguments on a motion for summary judgment.

during the accident and proceeded to a restroom to clean his mouth.  (Williams Dep. 65-66.)

When he returned, Williams was instructed that he needed to submit to a drug test because he

had been in an accident.  (*Id.* at 62, 67.)  Williams did not dispute that the Company had the right

to subject him to a drug test.  (*Id.* at 29, 34.)

Because Steelcraft believed Williams could be under the influence of alcohol or drugs, it

paid for a cab to take him to a drug-testing facility.  Williams was taken to Bethesda Care in

Sharonville, Ohio, where he submitted a urine sample.  Bethesda Care sent the sample to

MedTox Laboratories, Inc. in Minnesota for analysis.  Steelcraft suspended Williams "pending

the results of investigation."  (Doc. 37-2 at 36.)

Ten days later, Williams's drug test results were returned.  The MedTox results indicated

a positive result for cannabinoids (marijuana) and cocaine.  (Williams Dep. Ex. C.)  The results

form contained a signature line for "James Keller MD" but the signature line was blank.  (*Id.*)

Instead, the form appeared to be signed in the lower right-hand corner by an "RN."  (*Id.*)

Plaintiff admits that he smoked marijuana approximately ten days prior to his May 15,

2006 drug test.  (Williams Dep. 35-36.)  He denies using cocaine, however.  Rather, he asserts

that he tested positive for cocaine was because he was exposed to secondhand smoke containing

cocaine at the Kentucky Derby, which was held on May 5, 2006.  (*Id.*)  After receiving the drug

test results, on May 25, 2006, Steelcraft terminated Williams for violating Work Rule 5.

## C.    The Grievance Process, Arbitration, and Negotiations for a New Substance Abuse Policy

Williams filed a grievance on May 15, 2006, which was signed by Robert Armentrout,

the Union's treasurer and a member of the grievance committee and safety committee, on behalf

of the Union.  (Williams Dep., Ex. H; Armentrout Dec. ¶ 1.)  The Company denied the grievance

at the second and third steps on the grounds that the discipline was consistent with the Work Rules.  (*Id.*, Ex. I; Brammer Dec. ¶¶ 18-19.)  The Union then appealed the grievance through arbitration.

After contacting the Union once by telephone within the month following his termination, Williams never again personally contacted the Union regarding the status of his grievance.  However, in May 2006, his attorney, James Hartke, contacted Armentrout and asked to represent Williams in the grievance process.  Armentrout told Hartke to contact David McLean, the United Steel Workers International staff representative assigned to service the Union.  In August 2006, Hartke began contacting McLean.  Hartke asked to represent his client at the arbitration hearing regarding the grievance filed over Plaintiff's termination.  McLean informed Hartke that the Union was the exclusive bargaining representative and the party to the CBA and that outside counsel was rarely allowed to assist with arbitrations.  McLean further told Hartke that "the local union has determined that Mr. William's grievance does in fact have merit and that they appealed this grievance to arbitration."  (McLean Dec. ¶ 5.)  From the spring of 2006 until early 2009, Hartke contacted Armentrout every few months to ask about the status of Plaintiff's grievance and arbitration.

In April 2008, the Union's grievance committee reviewed several pending grievances with McLean.  The Union decided to withdraw several pending grievances that did not, upon review, allege violations of the CBA.  Prior to this time, the Union had sought to negotiate a new substance-abuse policy with Steelcraft because the Union took the position that the zero-tolerance policy could only be changed through collective-bargaining.  Official negotiations regarding the new substance abuse policy had begun in 2008 and continued throughout the

5

period that Williams's grievance remained pending.  The Union initially had hoped that it could

reach an agreement with Steelcraft to apply the new policy retroactively to pending grievances

like Williams's grievance.  (Armentrout Dec. ¶ 5.)  However, during the negotiations, Steelcraft

made clear that it would not agree to apply a second-chance policy retroactively.  (Brammer

Dec. ¶ 16.)  Accordingly, the Union made the decision to withdraw Williams's grievance in

April 2008.  (Brammer Dec. ¶ 20; McLean Dec. ¶ 6.)  Armentrout did not inform Hartke until

late 2008 that Williams's grievance had been withdrawn.

 The parties finally agreed on a new substance abuse policy in January 2009.  The new

policy is not a zero-tolerance policy.  The Union could not get the Steelcraft's agreement to

apply the new drug policy retroactively.  No Union member who tested positive for illegal drugs

under the prior zero-tolerance policy—the policy in place at the time of Williams's work-related

accident and positive drug test—ever was returned to work by Steelcraft, and no arbitrator ever

reinstated any Union member who was terminated for possessing, using, or testing positive for

illegal drugs.

## D. Procedural History

 Williams filed an Amended Complaint against Steelcraft and the Union on December 7,

2009.  (Doc. 15.)  Defendants both moved for dismissal of the Amended Complaint.  (Docs. 19,

20.)  The Court granted the motions in part and held that the only claim remaining for

adjudication was a hybrid claim pursuant to § 301 of the Labor Management Relations Act

("LMRA"), 29 U.S.C. § 185, against Steelcraft for breach of the CBA and against the Union for

breach of the duty of fair representation.  (Doc. 29.)  Steelcraft and the Union now move for

summary judgment on the hybrid claim.  Steelcraft also moves to strike exhibits submitted by

Williams as attachments to the Affidavit of James Hartke.

## II.     STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.  A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

## III.     ANALYSIS OF SUMMARY JUDGMENT MOTIONS

Section 301 of the LMRA authorizes employees to bring hybrid suits against their

employers and labor organizations.  29 U.S.C. § 185.  When an employee seeks to bring suit against his employer for breach of a collective bargaining agreement, the employee usually is limited by the requirement that he first exhaust any grievance or arbitration remedies provided for in the collective bargaining agreement.  *DelCostello v. Int'l Bhd. Of Teamsters*, 462 U.S. 151, 163 (1983).  Further, the result of the grievance or arbitration usually is subjected to only a narrow judicial review.  *Id.* at 164.  However, "when the union representing the employee in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation . . . , an employee may bring [a § 301] suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding."  *Id.*  The employee must prove both that his discharge was contrary to the collective bargaining agreement and that the union breached its duty of fair representation in order to prevail against either the company or the union.  *Id.*; *Garrish v. Int'l Union United Auto., Aerospace and Agric., Implement Workers of Am.*, 417 F.3d 590, 594 (6th Cir. 2005).

Defendants here move for summary judgment on the basis that as a matter of law Williams cannot establish either that Steelcraft breached the terms of the CBA or that the Union breached its duty of fair representation.

## A. Whether The Company Breached the CBA

To prove his § 301 claim, Williams first must establish that a genuine material fact is in dispute regarding whether his termination was proper under the terms of the CBA.  Williams challenges here whether his drug test results were reliable, whether Steelcraft has established that he violated Work Rule 5, and whether Steelcraft can enforce Work Rule 5 as a zero-

8

tolerance policy.  The Court will begin by examining the last issue.

To determine if the CBA was breached, the Court looks "to the plain meaning of the agreement."  *Roeder v. Am. Postal Workers Union, AFL-CIO*, 180 F.3d 733, 737 (6th Cir. 1999). The CBA granted Steelcraft the "right to establish reasonable rules and regulations governing the conduct of employees."  (CBA, doc. 38-3 at 24.)  It is undisputed that Steelcraft implemented Work Rule 5 pursuant to the CBA.  The parties disagree as to how Work Rule 5 was interpreted and applied by Steelcraft.  Williams asserts that pursuant to the plain language of Work Rule 5, Steelcraft had to establish not only that he tested positive for drugs, but that he was "under the influence" of drugs "during scheduled working time."  (Williams Dep., Ex. A.)

Work Rule 5 is ambiguous to the extent that the phrase "under the influence" is not defined.  Therefore, the common practices between the Union and Steelcraft can be considered when interpreting Work Rule 5 and its application under the CBA.  *See Earle v. Netjets Aviation, Inc.*, 262 F. App'x 698, 702 (6th Cir. 2008) (stating that an "arbitrator properly considered the implementation of the agreements through custom and practice after having determined that the agreements did not address the question" in dispute); *Int'l Bhd of Teamsters, Local 519 v. UPS, Inc.*, 335 F.3d 497, 507-08 (6th Cir. 2003) (stating that an arbitrator can consider the "practices of the shop" when the collective bargaining agreement is ambiguous).  Steelcraft and the Union agree that, at the time of Williams's discharge, Steelcraft enforced Work Rule 5 as a zero-tolerance policy which authorized the termination of an employee who tested positive for drugs regardless of his or her level of intoxication.  In fact, Williams admitted that no Union member who tested positive for illegal drugs under the zero-tolerance policy ever was returned to work by Steelcraft voluntarily or by order of an arbitrator.  (Doc. 37 ¶ 50; Doc. 42 ¶ 50.)  Williams

presents no evidence upon which a reasonable jury could conclude that Steelcraft enforced Work Rule 5 as anything other than a zero-tolerance policy before it was amended in January 2009 in consultation with the Union.  The Court concludes that Steelcraft did not violate the CBA by enforcing Work Rule 5 as a zero-tolerance policy.

Steelcraft also must establish that Williams violated Work Rule 5.[2]  Steelcraft relied on the drug test results provided by MedTox Laboratories.  The test results indicated that Williams tested positive for cannabinoids (marijuana) and cocaine.  (Williams Dep. Ex. C.)  Williams attacks the reliability of the test results.  Defendants submitted evidence in the form of a citation to the Federal Register that MedTox was a federally-certified drug-testing laboratory in 2011.  (Doc. 38-4.)  Williams retorts that this evidence does not establish that MedTox was federally certified in May 2006.  However, a quick review of the Federal Register during the relevant time period establishes that MedTox was certified by the federal Substance Abuse and Mental Health Services Administration to "conduct drug and specimen validity tests on urine specimens for Federal agencies" in both May 2006 and June 2006.  Current List of Labs. Which Meet Minimum Standards to Engage in Urine Drug Testing for Fed. Agencies, 71 Fed. Reg. 32111-01 (June 2, 2006); Current List of Labs. Which Meet Minimum Standards to Engage in Urine Drug Testing for Fed. Agencies, 71 Fed. Reg. 27740-04 (May 12, 2006).

Williams also complains that the test results were not signed by medical doctor, despite the presence of a signature line for "James Keller MD," and points to similar purported

---

[2] As set forth in Section IV below, the Court does not give *res judicata* effect to an Ohio state court determination—for purposes of Williams's entitlement to state unemployment compensation—that Steelcraft did not establish that Williams violated Work Rule 5.

irregularities on the face of the test results.[3]  The test results do appear to be signed by a registered nurse.  Additionally, Williams does not provide any expert testimony or identify any case law holding that the drug results are invalid or inherently unreliable based on such purported irregularities.  Finally, Williams undercuts his own reliability argument when he admits that he smoked marijuana and was exposed to second-hand cocaine smoke at a Kentucky Derby party on May 5, 2005.[4]  (Williams Dep. 35-36.)

Next, Williams objects that MedTox did not specify a toxicology level.  The test results were not unreliable on this basis.  Neither the CBA nor Work Rule 5 required Steeltech to prove a certain detectable level of the narcotics.  The Court, moreover, has found that Steelcraft was permitted to enforce Work Rule 5 as a zero-tolerance policy such that any amount of drugs justified the discharge of an employees.

For all of the these reasons, Williams has failed to establish that material facts are in genuine dispute regardinging whether Steelcraft violated the CBA when it terminated Williams for violating the zero-tolerance substance abuse policy.

**B.      Whether the Union Breached the Duty of Fair Representation**

Williams also must prove that the Union breached its duty of fair representation in order to establish a hybrid § 301 claim.  The right to fair representation arises from the National Labor

---

[3] For example, Williams states that the results "do not demonstrate a chain of custody," are not signed by the recipient, and do not indicate whether sample seal was intact upon receipt. He also infers that different versions of the test results exist (but were not provided to the Court) in which a physician's signature was stamped on the results.

[4] Defendants imply that Williams's explanation for the positive cocaine result is implausible.  The Court need not and does not render an opinion on the plausibility of Williams's explanation.

Relations Act ("NLRA"), 29 U.S.C. § 158(b), and provides that a union's "statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  *Vaca v. Sipes*, 386 U.S. 171, 177 (1967); *see also Marentette v. Local 174, United Auto Aerospace and Agri. Workers of Am.*, 907 F.2d 603, 615 (6th Cir. 1990) (same).  To determine if a union breached its duty of fair representation, the Court asks "whether the [u]nion's conduct in representing [its member] was arbitrary, discriminatory, or in bad faith."  *Roeder*, 180 F.3d at 737.  Mere negligence by a union is not sufficient to establish a breach of the fair representation duty.  *See United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372-73 (1990); *Roeder*, 180 F.3d at 737.  Instead, the union's conduct must be irrational for liability to attach.  *Roeder*, 180 F.3d at 737.

Williams makes three primary arguments that the Union breached its duty of fair representation.  First, Williams asserts that the Union should have challenged the drug test results.  As discussed above, Williams perceives irregularities on the face of the test results, but he has identified no case law or expert opinion which supports his contention that the results were unreliable on the basis of the perceived irregularities.  *Cf. Walk v. P*I*E Nationwide, Inc.*, 958 F.2d 1323, 1327 (6th Cir. 1992) (stating that the "laboratory procedures about which the plaintiff complains are highly technical and beyond the common understanding of even competent and knowledgeable union officials" and that the union "was not required to consult a scientist at its expense to understand all the ramifications of drug testing[,]" particularly in the absence of an "obvious indication that the laboratory's standards were lacking.")  Also, the testing was conducted by a federally-certified laboratory.  Finally, Williams admitted that he had

used marijuana and been exposed to second-hand cocaine smoke ten days prior to being tested. (Williams Dep. 35-36.)  No reasonable jury could conclude in the particular circumstances that the Union acted in an arbitrary, unfair, or irrational fashion when it did not challenge the test results.

Williams's second argument is that the Union should have challenged the zero-tolerance policy.  More specifically, Williams argues that the Union should have argued that Steelcraft could not enforce Work Rule 5 as a zero-tolerance policy.  Instead, the Union took the position that the zero-tolerance interpretation of Work Rule 5 could be changed only through collective bargaining.  Williams cites no authority to support the inference that a union breaches its duty of fair representation simply because it supports a company position which is contrary to the position advanced by its member.  Rather, the Supreme Court has instructed that a union does not breach its duty of fair representation merely because it determines that a grievance lacked merit, regardless of whether a judge or jury ultimately agrees.  *Vaca*, 386 U.S. at 192-93; *see also White v. Detroit Edison Co.*, 472 F.3d 420, 426-27 (6th Cir. 2006) (stating that a union's decision to withdraw a grievance for lack of merit, even if the grievance was ultimately found to have had merit, cannot be the basis of a fair representation claim unless the union acted arbitrarily or in bad faith.)  Here, the Union agreed in the CBA to give Steelcraft the authority to craft reasonable work rules.  The evidence demonstrates that Steelcraft had been consistent in treatment of Work Rule 5 as a zero-tolerance policy.  The Union had been unable to obtain reinstatement of any member who had tested positive for drugs.  Williams has not established that the Union's belief that Work Rule 5 would have to be changed through collective bargaining was irrational or taken in bad faith.

13

Finally, Williams argues that the Union breached its duty because it failed to actively communicate with Williams or his attorney during the grievance process.  The Union, as the exclusive representative of the employees, (CBA, doc. 38-3 at 7), was not required to permit Williams's attorney to participate in the arbitration process.  *Cahall v. Big Bear Stores*, No. 84-3952, 1986 WL 17467, at *4 (6th Cir. Aug. 27, 1986) (per curiam).  Williams has not submitted evidence that the Union treated other grievants or grievances more favorably under similar situations.  Nor has he established that the outcome of his grievance would have been more favorable or different if the Union had communicated more frequently with him or his attorney. A delay or failure in communication does not amount to a breach of the duty of fair representation in this case in the absence of prejudice caused thereby.  *See Ryan v. Gen. Motors Corp.*, 929 F.2d 1105, 1109 (6th Cir. 1989) (finding that failure to give timely notice was not a breach when no prejudice resulted).

## IV.     MOTION TO STRIKE

Steelcraft moves the Court to strike the testimony and exhibits presented during the state administrative proceedings on the matter of Williams's entitlement to unemployment compensation.  Steelcraft posits that the evidence is inadmissable in this Court pursuant to Ohio law.  The Ohio Revised Code restricts the admissibility of information maintained by the Ohio Department of Job and Family Services ("ODJFS") in connection with unemployment compensation disputes as follows:

> [T]he information maintained by the director of job and family services or
> furnished to the director by employers or employees pursuant to this chapter is for
> the exclusive use and information of the department of job and family services in
> the discharge of its duties and shall not be open to the public or be used in any
> court in any action or proceeding pending therein, or be admissible in evidence in
> any action, other than one arising under this chapter or section 5733.42 of the

14

Revised Code.

Ohio Rev. Code § 4141.21.

Despite this statute, ODJFS records are not entitled to an absolute privilege in federal courts.  *See Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 720 (S.D. Ohio 2006); *Freed v. Grand Court Lifestyles, Inc.*, 100 F. Supp. 2d 610, 612 (S.D. Ohio 1998).  "State privilege law is not controlling [in federal court] in federal question cases."  *Freed*, 100 F. Supp. 2d at 612.  Rather, privilege issues in a federal question case are governed by the principles of common law.  *See id.* (citing Fed. R. Evid. 501).  The district court in *Klaus* admitted the ODJFS records in an employment discrimination case as evidence that the employer's purported justifications for terminating an employee were inconsistent and therefore pretextual.  437 F. Supp. 2d at 720.  A different court in the Southern District of Ohio similarly admitted an employee's statements from her unemployment compensation matter on the grounds that the statements might be inconsistent with her claim in federal court that she was terminated for discriminatory reasons.  *See EEOC v. Honda of Amer. Mfg., Inc.*, No. 2:06-cv-0233, 2006 WL 2934072, at *2 (S.D. Ohio Oct. 12, 2006).

Here, Williams submits testimony and evidence provided by the parties to the Ohio Unemployment Compensation Review Commission in the administrative proceedings.  Williams posits that these materials are the evidence ultimately relied upon by Judge William Mallory of the Hamilton County, Ohio Court of Common Pleas when he overturned the administrative decision against Williams.  (Doc. 24-2 at 3.)  Judge Mallory ruled in conclusory fashion that Steelcraft had not established that Williams had violated Work Rule 5, at least insofar as was relevant to Williams's claim for unemployment compensation.  (*Id.*)  However, Ohio law

15

provides that the decisions of a hearing officer or of a reviewing court in an unemployment

compensation case have no preclusive effect.  The Ohio Revised Code states as follows:

> No finding of fact or law, decision, or order of the director, hearing officer, the
> commission, or a reviewing court under this section or section 4141.28 of the
> Revised Code shall be given collateral estoppel or res judicata effect in any
> separate or subsequent judicial, administrative, or arbitration proceeding, other
> than a proceeding arising under this chapter.

Ohio Rev. Code § 4141.281(D)(8).  The Sixth Circuit has cited this statute as grounds for not

giving *res judicata* effect to an ODJFS finding that an employee's termination was not justified.

*Murray v. Kaiser Permanente*, 52 F. App'x 725, 726 (6th Cir. 2002).  Accordingly, the state

court judgment itself has no preclusive effect in this litigation.

Williams specifically cites to the testimony during the administrative proceedings of Carl

Parson, the Labor Relations Manager for Steelcraft, that he [Williams] had no prior disciplinary

history and would not have been terminated absent the positive drug test.  (Doc. 43-2 at 10, 12,

17.)  That testimony from the unemployment compensation proceedings is consistent with the

position taken by Steelcraft in this litigation.  Williams also cites evidence from the

unemployment compensation hearing that his accident, examined by itself, did not demonstrate

that he was intoxicated at work because the steel beam was located in such a position as to pose

an occupational hazard.  (Doc. 43-2 at 21-22; Doc. 43-3 at 1-3.)  Again, this evidence does not

contradict Steelcraft's position here that the company relied on the positive drug test result, not

the accident, as grounds to terminate Williams.  Accordingly, the Motion to Strike will be denied

as moot because the consideration of the evidence does not prejudice Steelcraft.

## V.     CONCLUSION

For the foregoing reasons, the Defendants' Motions for Summary Judgment (docs. 38,

16

39) are **GRANTED** and Steelcraft's Motion to Strike (doc. 45) is **DENIED AS MOOT**.

IT IS SO ORDERED.

_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court